IN re MILLER'S ESTATE; MILLER et al. v. LIVINGSTONE.

No. 1754.   Decided December 22, 1906 (88 Pac. 338).

1. WILLS—UNDUE INFLUENCE—WHAT CONSTITUTES. Undue influence to avoid a will must be such as to destroy the free agency of the testator at the time the will is made. It must be a present restraint operating on the mind of the testator at that time.

2. SAME—PRESUMPTIONS. A will drawn at the request and direction of the sole beneficiary, who was active in procuring and superintending its execution, is not looked on with favor, and the court will carefully examine into the circumstances attendant on its execution and will scan the evidence offered to procure its probate and such circumstances may be sufficient to exclude the will unless the suspicion is removed and the court is satisfied that the paper propounded expresses the true will of the testator.

3. SAME. The sole beneficiary in a will gave instructions for the will and directed its terms. It was drawn at her request. *Held*, that the will must be regarded as having been written by the beneficiary within the rule casting suspicion on a will drawn at the request and direction of the sole beneficiary which may be sufficient to prevent the probate thereof unless the suspicion is removed.

4. EVIDENCE—SUIT TO CONTEST WILL—ADMISSIONS OF SOLE LEGATEE. The admissions of the sole legatee in a will are admissible in evidence against the will in a suit to revoke the probate thereof, not only as bearing on the credibility of the legatee as a witness, but as substantive evidence of an admission against interest of a fact in issue.

5. SAME—WEIGHT OF ADMISSIONS. The time, place, and circumstance of making of an admission by a sole legatee under a will go to the weight and not to the competency of the admission as evidence.

6. WILLS—CONTEST—EVIDENCE. In a suit to revoke the probate of a will on the ground of undue influence, it is competent to show the conduct of the person charged with procuring the making of the will both before and after its execution as showing his influence over the testator at the time of the making of the will.

7. SAME—DECLARATIONS OF TESTATOR—ADMISSIBILITY. Though the declarations of a testator are not admissible as impeachment of the validity of his will, declarations showing his state of mind are admissible on the issue of undue influence.

8. EVIDENCE—DECLARATIONS. Where, in a suit to revoke the probate of a will on the ground of undue influence, the evidence showed a continuous effort on the part of the sole beneficiary to create in the mind of the testator a feeling of disregard for his children by a former wife, and that she procured the making of the will against his wishes, and thereafter, by the same means, prevented a revocation of it, evidence of the declarations of the beneficiary and of the testator subsequent to the execution of the will were admissible as against the objection of remoteness, especially when the presumption of the validity of the will from its nondestruction during a period of over ten years was relied on.

9. APPEAL—ERRONEOUS EXCLUSION OF EVIDENCE—HARMLESS ERROR. In a suit to revoke the probate of a will on the ground of undue influence, the exclusion of declarations of the testator and admissions of the sole beneficiary made subsequent to the execution of the will was prejudicial, though witnesses were permitted to testify to similar facts occurring at or about the time of the execution of the will.

10. WITNESSES—TRANSACTIONS WITH DECEASED PERSONS—STATUTES—APPLICABILITY. Revised Statutes 1898, sections 3412, 3413, providing that a party to an action in which the adverse party sues or defends as executor or legatee of a deceased person shall not testify to transactions with decedent, etc., does not apply to a suit to contest a will between the heirs at law of the testator and the devisees or legatees under the will or their heirs.[1]

11. SAME. Revised Statutes 1898, sections 3412, 3413, prohibiting a party in which the adverse party is the executor or legatee of a decedent to testify to any transaction with the decedent, etc., if applicable to a suit to contest a will does not disqualify an heir of the testator from testifying as to statements made by, or transactions had with the sole beneficiary since deceased, though her heir,

[1] Atwood's Estate, 14 Utah, 45 Pac. 1036, 60 Am. St. Rep. 878, overruled.

in her individual capacity, is a party defendant and adverse to the heir of the testator, but the heir of the testator is disqualified from testifying as to matters of fact which must have been equally within the knowledge of the testator or as to any transactions with or statements made by him.

12. WILLS—SUIT TO REVOKE PROBATE—FORM OF ACTION. Under Revised Statutes 1898, sections 3794, 3796, 4041, 4042, providing that, where the court is satisfied that a will was duly executed and that the testator was of sound mind and was not acting under undue influence, a certificate of the proof must be attached to the will, and any person who has not contested the will may contest the probate thereof at any time within one year, and all issues of fact joined in probate proceedings must be tried in conformity with the requirements of the Code of Civil Procedure, and, if no jury is demanded, the court must try the issues, a suit to revoke the probate of a will on the ground of undue influence is an action at law.

13. APPEAL—ACTION AT LAW—REVIEW OF EVIDENCE. The Supreme Court in an action at law cannot treat as found that which might have been found, or weigh and pass on conflicting evidence, or pass on the credibility of witnesses, for such matters are within the province of the trial court where the case is tried before the court without a jury and within the province of the jury when tried before a jury.

14. SAME. The supreme court on appeal in an action at law cannot pass on the weight or effect of excluded or admitted testimony and from all of it determine what findings of fact ought to have been made.

McCARTY, C. J., dissenting in part.

APPEAL from District Court, Third District; C. W. Morse, Judge.

Action by Margaret Miller and others against Elizabeth Livingston, as administratrix of Margaret Miller, deceased, and individually. From a judgment for defendant, plaintiffs appeal.

REVERSED, AND NEW TRIAL GRANTED.

*James D. Pardee* for appellants.

*Andrew Howat* and *Hurd & Hurd* for respondent.

31 Utah—27

A circumstance to be considered was the confidential relation existing between the testator and devisee, and also the unnaturalness and injustice of disinheriting his children whom he loved and always calculated to provide for. Such circumstances and others that appear from the testimony, throw the burden upon the proponents. (29 Am. and Eng. Ency. of Law, 113, 114; Underhill on Wills, par. 137; *Dalfield v. Parish,* 25 N. Y. 35; *Bush v. Delano,* 71 N. W. [Mich.] 629; *England v. Fawbush,* 204 Ill. 384.)

"That if a party writes or prepares a will under which he takes a benefit, that is a circumstance which generally ought to excite the suspicion of the court, and calls upon it to be vigorous and zealous in examining the evidence in support of the will, in favor of which it ought not to pronounce unless the suspicion is removed and it is judicially satisfied that the paper propounded does express the true will of the deceased." To the same effect are the following cases: *In the Matter of the Will of Smith,* 95 N. Y. 216, 523; *Hughes v. Meredith,* 24 Ga. 325; *Montague v. Allen's Executors,* 78 Va. 592; *Coffin v. Coffin,* 23 N. Y. 9; *Cuthbertson's Appeal,* 97 Pa. State 163; *Marx v. McGlin,* 88 N. Y. 358; *Yeardley v. Cuthbertson,* 108 Pa. State 395, 457; *Lynch v. Clements,* 24 N. J. Eq. 431, 435; *Gay v. Gillian,* 92 Mo. 250; *Hartman v. Strickler,* 82 Va. 225, 227, 238; *Crystal v. Dubois,* 4th Barber 393, 398; *Tyler v. Gardner,* 25 N. Y. 559; *Lee v. Dill,* 11 Abbott's Practice 214; *Lake v. Ranney,* 33 Barb. 49; *Bergen v. Udall,* 31 Barb. 9, 25; *Burt v. Nolan,* 1 Dem. 436; *Matter of Western,* 60 Hun 298; *Harvey v. Sutters,* 46 Mo. 147; *McLaughlin v. McDevitt,* 63 N. Y. 213; *Brick v. Brick,* 66 N. Y. 144.

The declarations and admissions of a sole devisee under a will are competent evidence. (29 Am. and Eng. Ency of Law 119; Underhill, par. 163; *Samuels' Appeal,* 54 Conn. 108; *Morse v. Stokes,* 21 Ga. 552; *Wilbur v. Wilbur,* 138 Ill. 436; *Horne v. Pullman,* 10 Hun 471; *Crocker v. Chase's Estate,* 57 Vermont 413; *Gordon v. Burris,* 141 Mo. 602.)

The court erred in sustaining the objection to question 15 asked of Mrs. McIntosh, as set out in assignment 12. The question was, "State all you know as to what Mr. Miller said about providing for his children after his death." This question was competent and material and shows what Mr. Miller's intentions were about providing for his children in his will and as showing what his state of mind was when the will was executed, for the reason that the declarations of a testator made before or after the execution of his will are admissible to prove undue influence or to show the condition of his mind. (Underhill, par. 161; 29 Am. and Eng. Ency. of Law, 117, 118, 119; *Matter of Calkins,* 112 Cal. 296; *Waterman v. Whitney,* 11 N. Y. 157; *Shailer v. Burnstead,* 99 Mass. 112; *Haynes v. Haydn,* 95 Mich. 332; *Hayes v. West,* 37 Ind. 21; *Middledich v. Williams,* 45 N. J. Eq. 726; *Bates v. Bates,* 27 Ia. 111; *Roberts v. Bidwell,* 98 N. W. 1000; *Revard v. Revard,* 109 Mich. 98; *Hayes v. West,* 37 Ind. 21; *Mallory v. Young,* 94 Ga. 804; *Cochran v. Cochran,* 17 Ill. App. 604; *In re Clark,* 40 Hun 233; *Canada's Appeal* 47 Conn. 450; *Mooney v. Olson,* 22 Kas. 69; *Baylen v. Muker,* 28 N. J. Law 274.) Declarations of testator made after will and while under no influence, are admissible for the purpose of showing undue influence. (*Cogheld v. Kennedy,* 24 S. R. 452; *Ball v. Cain,* 39 Atl. 778; *Moore v. Gibbons,* 54 Ill. Appeal, 163; *Primer v. Primer,* 75 Iowa, 415; *Bush v. Delano,* 71 N. W. R. *The Estate of Goldthrope,* 58 Am. St. 400. Underhill, par. 61, and cases cited in note on page 227.)

RESPONDENT'S POINTS.

The term "legal representative," or "personal representative," in the commonly accepted sense, means the administrator or executor of a deceased person, but this is not the only definition. It may mean heirs, next of kin, or descendants, and sometimes, assignee, or grantee. (*Warnecke v. Lembca,* 71 Ill. 91; *Davis v. Davis,* 26 Cal. 23; *Davies v. Davies* [Conn.], 11 At. 500; *Greenwood v. Holbrook* [N. Y.], 18 N. E. 711; *Griswold v. Sawyer* [N. Y.], 26 N. E.

464, 465.) Both Mr. and Mrs. Miller were dead and the conversations and transactions about which the witnesses were interrogated were with Mr. and Mrs. Miller, as to facts equally within the knowledge of the witnesses and the deceased persons with whom it was desired to show the conversations and transactions were had. It was to prevent such testimony that the statute was enacted, and the questions and answers not only fell within the spirit, but within the letter of the statute forbidding such testimony. (*In re Atwood's Estate,* 14 Utah 1; *Hennefer v. Hayes,* 14 Utah 324; *Whitney v. Fox,* 8 Utah 380; *Whitney v. Fox,* 166 U. S. 637, 644.) The doctrine that an act between parties will be scrutinized and that the burden of proof is upon the party seeking to sustain it, where the relations between the parties are of a confidential nature, does not apply to the making of wills where the parties are husband and wife, father and child. (*Tyson v. Tyson,* 37 Md. 567; *Bulger v. Ross,* 98 Ala. 267; *Mason v. Williams,* 6 N. Y. Supp. 479; *Appeal of Dale,* 57 Conn. 127.)

STRAUP, J.

1. This is an action brought to revoke a will alleged to have been executed by Thomas Miller, deceased, under undue influence. Mr. Miller was married twice. He lived with his first wife in Scotland and in New York, by whom he had five children. His wife died in 1885. In the same year he married his second wife, Margaret Miller, who theretofore had been an acquaintance of his in Scotland, and who, at the time of the marriage, was a resident of Utah, where she lived with a former husband, but from whom she was divorced just prior to her marriage with Miller. Mr. Miller and his second wife lived together a short time in New York and then moved to Salt Lake City, Utah. Mr. Miller's children, who were then of age, remained in New York. Soon after arriving at Salt Lake City he invested about $4,000 in a silk factory, but lost most of his investment. He then engaged in the business of a brass foundryman, his usual occupation in which he prospered and made

considerable money. In 1890, when he was about 65 years of age, he made the will in question, devising and bequeathing all his property, then worth about $3,000 in value, to his wife. He died in September, 1901. He was then worth from $17,000 to $30,000. All his property went to his wife under the will. His wife, Margaret Miller, died March 10, 1904, leaving Elizabeth Livingston, a sister her only heir at law. The will was not admitted to probate until May 20, 1904. Elizabeth Livingston was then appointed administratrix of his estate with the will annexed. On May 6, 1905, Miss Margaret Miller, a daughter of Thomas Miller, deceased, on her behalf and on behalf of the other heirs of Thomas Miller, filed a complaint in the Third judicial district court in and for the county of Salt Lake to revoke the will, alleging, among other things, that at the time of its execution, Thomas Miller was "acting under duress, restraint, and undue influence, and fraudulent representations in this: that in his younger days he had formed an uncontrollable attachment with and for the person named as his wife in the will presented for probate to such an extent that he deserted his family in Scotland, where he was then living, and came to New York state, where his family soon followed him, and he was compelled to support them and leave said devisee; also that, after a time, the wife of said Thomas Miller, now deceased, died, he deserted his children and came to Utah with the said person named as devisee in said will and afterwards married her, or attempted to do so, at the solicitation and under the influence of said devisee, and has ever since been under her influence and restraint. And further, that, under the undue influence, duress, and restraint of such person, said decedent was induced and compelled to make the said will against his own wishes, desires, and intentions, as petitioner is informed and believes; and further, that misrepresentations were made to said decedent, to get him to make and sign said will heretofore probated, that his said children had received their share or portion of his estate at the time of his first wife's death, and had received a portion of the property owned by their mother and in that way had

received their full proportion and right to any interest in his said estate as heirs or otherwise, and said devisee had so worked upon the mind of the decedent by telling him that his children cared nothing for him, that they only desired to receive his property, and by other false and fraudulent representations the devisee so influenced the mind of the decedent against his children that he cut them off as heirs to his estate in said will described, and by these means and other inducements, undue influence, and coercion, said decedent was influenced to sign said will and to give, bequeath, and devise all his estate to said devisee and away from his children and against his real intentions." On August 28, 1905, Elizabeth Livingston, as administratrix of the estate of Thomas Miller with the will annexed, answered the complaint denying all the material allegations, except the relationship of the parties. On the day of the trial, October 25, 1905, Elizabeth Livingston, in her individual capacity, over the objection of the plaintiff, was permitted to file an answer similar to the one filed by her as administratrix. The case was tried before the court without a jury, who found in favor of the will. A judgment was entered accordingly. The plaintiff appeals, contending that the court erred in excluding testimony, and that the findings are not supported by but are contrary to the evidence.

2. Mr. Schettler, a banker who was intimately acquainted with the Millers from the time they came to Utah until the death of Mr. Miller, and who was a sort of confidential adviser for them, and who was a witness to the will, testified on behalf of the plaintiff: That he drew the will at the request of the testator's wife. That she alone came to him and told him that she wanted the will made so as to cut off the testator's children with $1 apiece. That she would fix them; that she was tired of having it go on like this, and therefore wanted the will made out in such manner as to cut off the children with $1 apiece, and to give her all the property, cash and real estate. That Mr. Miller wanted to favor his children in New York. That she knew what they were, and would not have it so, and that she wanted the property her-

self. That when asked if Mr. Miller would be willing to sign that kind of a will she replied: "Oh, yes; he will have to do it. I won't have it any other way." She said she and Mr. Miller did not agree. She was anxious and excited, and wanted the will made out as quickly as possible, and stated that it had gone on long enough, and that she was desirous of having the will made out as she told him. She gave him the names of the children, with directions to leave $1 each for them. The witness told her that she would have to remember them with a little something and she said she was anxious to get the will made out so that she might have things her own way and fix those children. The witness drew a rough copy of the will as directed by her, which was then copied by a clerk in the bank. The will when drawn was inspected by Mrs. Miller and was approved by her. She told the witness that Mr. Miller would call on him at a certain time and day to sign the will and to have it ready for him. A few days after that, and in accordance with what Mrs. Miller had said, Mr. Miller alone called at the office of the witness. The witness told him that Mrs. Miller had been there and had requested him to make out such a will and Mr. Miller said: "Well, yes; I suppose so; I suppose it will have to be so to keep peace, to keep peace"—repeated it several times. Mr. Miller, prior to and after the making of the will, told the witness that he had to do it to keep peace. Prior to the making of the will he had expressed himself to the witness that he had an affection for his children, and that he had promised to remember them in his will, that he calculated to have it so, and that they should have a proper share. The will was read over to him and was signed by him in the presence of the witnesses. He possessed usual intelligence, knew what he was signing, and was then in ordinarily good physical and mental health. He said that he wanted the will and that he would take care of it, and when he left he took it with him. A few days thereafter he told the witness that he had it locked up in a tin box with other valuable papers, and that he calculated to keep it. He kept the key to the box about his person and no one had

access to the box until after his death. He died very suddenly, and as his trousers were being removed and his body dressed by the undertaker, the key fell to the floor and was picked up by Mrs. Miller. This witness testified at the hearing, when the will was admitted to probate, that the testator was not composed mentally, in the sense that he could not do as he wanted to do; that his wife made him do certain things he did not want to do; that she made him sign the will; and that it was not according to his wishes.

Another witness, a Mrs. McIntosh, in no manner related to the deceased or to the parties, testified on behalf of plaintiff that she was well acquainted with Thomas Miller and his family in New York, and that she visited him in 1895. Mr. Miller then told her that his wife was very jealous of his regard for his children and that he could not speak of them in terms of affection without exciting her displeasure, which caused him great unhappiness; that for years his wife had endeavored to make him believe that his children only cared for him because of the money he might leave them; that they had no affection for him and that he owed them no duty of any kind; that occasionally he made small loans of money to his children; that whenever he did so she argued with him that such was proof that all his children wanted was as much money as they could get out of him; that this was the atmosphere in which he had lived for years; that at her repeated solicitations he had made a will in her favor which left his children nothing; that he made the will because of her insistence, and to obtain peace and a cessation of her constant importunities; that the will was not his wish but her wish; that it did not express what he desired or intended to do; that he intended to make another will which he would keep secret from her, in which he would provide abundantly for his children; that he did not dare to inform his wife of such intention because she would make his life miserable if she knew it, as she had done before he yielded to her and made the existing will.

Laura Miller, a granddaughter of the deceased, testified

on behalf of plaintiff that Mrs. Miller told her that she had the property and money fixed to suit her; that Mr. Miller had no will in the matter but hers; that she could and did rule him in every respect; that after having many scenes she had prevailed on him to draw up a paper turning everything over to her on his death; that the property was in her name, thereby cutting off his family; that Mrs. Miller asserted that the family would get nothing; that she had fixed them all right, having compelled Mr. Miller to put everything in her name and to make a will leaving her everything; that she was going to do as she pleased with the property; and that no one would know how it was to be divided until after her death.

Two witnesses, who were intimately acquainted with Mr. and Mrs. Miller, testified on behalf of defendant that Mr. and Mrs. Miller appeared to be harmonious and affectionate towards each other; that Mrs. Miller was attentive to Mr. Miller, and that they were both strong-minded. One of them testified that she heard Mr. Miller say in the year 1890 that it was due Mrs. Miller to be protected, that they were both getting old, and that it was through her influence that he was able to provide anything for her. The other witness testified that Mr. Miller never said anything in his presence as to providing for his wife by will.

The other subscribing witness to the will was called by the defendant and testified that he was requested to sign as a witness to Mr. Miller's signature, and that Mr. Miller seemed to be perfectly aware of what was going on, and if he was interfered with by any one there was not the slightest sign of it. The witness could not remember whether the will was read over to the testator, and had no recollection that at the time of the signing of the will Mr. Miller said that he executed it for the sake of peace or to please anybody. Outside of testifying that he was requested to sign as a witness, and that the testator seemed to be aware of what he was doing, the witness did not testify to anything said or done at the time of the execution of the will, or to any facts indicating that the testator freely or voluntarily, or otherwise, ac-

knowledged the execution of the will, or that it was or was not in accordance with his wishes.

3. In view of a reversal of the case upon the points hereafter to be considered, it is not necessary to pass upon the question as to whether the findings are contrary to the evidence. The trial court sustained the defendant's objections to the following questions asked by plaintiff of the witness Schettler: "Q. Did you ever have any conversation with Mrs. Miller after the execution of the will, about the will or about Mr. Miller's children? A. Yes; some. Q. What did she say? Q. Did Mrs. Miller ever tell you anything about her affection or regard for Mr. Miller's children? A. Yes, sir. Q. What did she say, and when was it? It was also shown that the witness had been intimately acquainted with the Millers, and often had visited at their house, but, on defendant's objections, the witness was not permitted to state, upon occasions referred to by him, as to Mrs. Miller's conduct towards the deceased's children between 1898 and 1900. Nor was he permitted to state how Mrs. Miller acted towards the deceased when anything was said about his children, nor as to her demeanor and conduct towards them or the deceased subsequent to the making of the will. The witness Mrs. McIntosh, who visited the Millers in 1895, was not permitted to testify concerning the feelings and disposition Mrs. Miller manifested towards the deceased's children subsequent to the making of the will, nor that Mr. Miller was constantly under the influence and control of his wife, and that he did not dare to express any opinion about his children in her presence. Upon defendant's objections, the witness Laura Miller was not permitted to answer the questions: "Q. While visiting your grandfather in Salt Lake City in the winter of 1900 and 1901, state how Mrs. Miller acted towards your grandfather and his children, and what was said about him and his children and his property? Q. State what the influence was that Mrs. Miller had over your grandfather, and if it was such that he had any mind of his own?" Other questions of like character were asked, some tending to show declarations against interest made by Mrs.

Miller, and others tending to show her conduct and demeanor in regard to manifestations of feelings of hostility and prejudice towards Mr. Miller's children. Likewise questions were asked of these witnesses as to statements made by the testator, some five, and some eight or nine, years after the will was made, in regard to the affection he bore his children, and the jealousy and prejudice manifested by his wife towards them, and with respect to the difference existing between himself and his wife, as reflecting the mental condition of the testator at the time the will was made. The objections urged against the testimony were that the matter sought to be elicited did not tend to throw any light upon the question as to whether the testator, at the time of the execution of the will, was unduly influenced, and that they were, therefore, too remote; that the statements and declarations made by Mrs. Miller, and the feelings manifested by her towards the children after the will was made, were immaterial and incompetent, especially such as were not expressed in the presence of Mr. Miller at or about the time the will was made; and that the will could not be invalidated by the parol declarations of the maker of the will made before or after the will was executed. The theory upon which the plaintiff sought the testimony was that the influence exerted over the testator by his wife was continuous; that her conduct and demeanor, and the declarations of the testator, subsequent to the making of the will, were all indicative of an influence exerted upon the testator's mind at the time the will was made, or, at least in some degree, reflected upon it; and that it was competent to show any admission or declaration made by Mrs. Miller, the sole beneficiary, against her interest.

We will not attempt to review these questions separately. It may be that some of them were objectionable as to form. The testimony, however, was excluded because of substance. We think the court took too narrow a view of the matter, and erred in excluding the testimony. It is true that undue influence, in order to avoid a will, must be such as to destroy free agency of the testator at the time the instrument is

made. It must be a present restraint operating on the mind of the testator at the time of the making of the testament. But, as was said by Mr. Justice Brewer,

"The question of undue influence is one of peculiar character; it does not arise until after the death of the one who alone fully knows the influences which have produced the instrument; it does not touch the outward act, the form of the instrument, the signature, the acknowledgment; it enters the shadowy land of the mind in search of its condition and processes." After stating in a general way what things may be inquired into, he further states: "This opens a broad field of inquiry and gives to such a contest over a will a wider scope of investigation than exists in ordinary litigation." (Mooney v. Olsen, 22 Kan. 69.)

At the outset it is well to observe that the will was drawn at the request and direction of the sole beneficiary, who was active in procuring and superintending its execution. There are cases holding that, under such circumstances, a presumption of undue influence arises sufficient to cast the burden of proof upon the proponent to show that the will was voluntarily executed. Other authorities hold that the burden is not shifted, but that it merely raises a suspicion which ought to appeal to the vigilance of the court; that such wills are not looked upon with favor; and that the court will cautiously and carefully examine into the circumstances which were attendant upon their execution, and will scan with a scrutinizing eye the evidence offered to procure their probate; and such circumstances may, in some instances, be sufficient to exclude the proposed will, unless the suspicion is removed and the court is judicially satisfied that the paper propounded does, in fact, express the true will of the deceased. (Underhill on Wills, section 137; *Delafield v. Parish,* 25 N. Y. 9.) We agree with the author above cited and with the authorities holding that the latter is the safer and the better rule. It is, however, claimed by the respondent that the rule has no application because the beneficiary here did not herself write the will, and that the rule should be applied only to such cases. But the beneficiary gave the instructions for the will, directed its terms, and it was drawn at her request, and, in judgment of law, it must be regarded

as written by herself. We perceive no difference as to whether she herself wrote the will, or as to whether it was written by another at her request and under her direction. (*Delafield v. Parish.*) A will made under such circumstances ought to appeal to the vigilance of the court and open a broad field of inquiry.

While the court admitted in evidence statements and declarations made by the testator and by Mrs. Miller at or about the time of the execution of the will and permitted plaintiff to show Mrs. Miller's feelings of hostility towards the deceased's children as manifested by her prior to and about the time of the making of the will, yet, in the main, the court excluded evidence of such feelings of hostility, and declarations against interest, manifested and made by Mrs. Miller subsequent to the making of the will, as well as many declarations and statements made by the testator. It seems the theory upon which this evidence was excluded was that the subsequent declarations and conduct of Mrs. Miller were immaterial and incompetent, and that the matter attempted to be elicited was too remote. The law, however, seems to be well settled that the admissions and declarations of the legatee are admissible in evidence against the will where he is the sole beneficiary under it. Such evidence is admissible not only as bearing upon the credibility of the legatee when a witness, but also as substantive evidence of an admission against interest of a fact in issue. (Underhill on Wills, section 163; *Saunders' Appeal,* 54 Conn. 108, 6 Atl., 193; *Gordon v. Burris,* 141 Mo. 602, 43 S. W. 642; 29 A. and E. Enc. L. 119.) Such admissions are competent evidence no matter when made. The time, place, and circumstance of their making go to the weight, not to the competency, of the evidence. Being substantive evidence of a fact in issue, the plaintiff was entitled to have admitted that distinct class or species of evidence, regardless of whether the original transactions with respect to which the admissions were made were clearly or only slightly supported. It is also competent to show the conduct of the person charged with procuring the will to have been made under undue in-

fluence both before and after its execution, as tending to
show his influence over the testator at the time the will was
made.   (*Wilbur v. Wilbur,* 138 Ill. 446, 27 N. E. 701.)
It is also well settled that, while the declarations of the
testator are not admissible as mere impeachment of the
validity of the will, yet, in so far as the state of mind of
the testator is material to the inquiry, and as to whether
undue influence was exerted, the declarations of the testator
showing his state of mind are admissible upon such issue.
His likes and dislikes, his feelings of affection towards per-
sons interested in the will, or his hatred and antipathy to-
wards others may always be shown.   It is important to as-
certain whether the mind of the testator was free from con-
straint at the time of the execution of the will, whether his
mind was then permitted to work out his intentions, or wheth-
er his mental operations were directed and dominated by
the stronger will of the person who is alleged to have exerted
undue influence.   What a man says to those about him is a
reliable test of the strength or weakness of his mental con-
dition.   For such purpose the declarations made by the tes-
tator, both before and after the execution of the will, may
be shown.   (Underhill, section 161.)   Of course, they
must be of such character and of such relevancy as to tend
to reflect the state or condition of the testator's mind at the
time of the execution of the will, and must not be so re-
mote as to indicate no such tendency.   But the question of
remoteness is not to be determined alone from the mere
period of time between the execution of the will and the
making of the declarations.   What may be unreasonable
and   remote   in   one   case   may   be   reasonable   and
not remote in another.   No fixed standard in this re-
spect can be laid down.   It must largely depend upon the
facts of each particular case, and the circumstances under
which the declarations are made.   It may well be said of this
case, as was said by the court in the case of *Haines v. Hay-
den,* 95 Mich. 332, 54 N. W. 911, 35 Am. St. Rep. 566:

"The testimony relating to the subsequent conditions and declarations of the testator, and the continuous dominion over him, was admissible for the purpose of weakening the presumption of the validity of the will to be drawn from its nondestruction during the period of ten years. . . . Is evidence of subsequent declarations admissible as tending to show the fact that the influence exerted accomplished its purpose and subjected the testator's will to that of the beneficiary? It is difficult to perceive why, on principle, such testimony is not to be received for this purpose. The state of the testator's mind at the very time of the execution of the will is, it is, of course, clear, the question to be solved, but it very rarely occurs that this state of mind can be shown by declarations made at the very moment of the execution of the will. . . . It is the theory of the contestant that the belief in her illegitimacy had been induced before the will was made; that this belief was kept alive by Margaret (the beneficiary) from that time on; that all these transactions were connected so closely as to constitute really one continuous effort by Margaret to create and to fan and to keep alive this belief to her profit by first causing the will to be made, and by thereafter preventing its revocation by the same means; and that all that was done in this regard was simply in furtherance of one fraudulent scheme, which related, not only to the inducing of the will, but the prevention of its revocation."

As in the case just cited, so here, the facts and circumstances occurring after the making of the will were facts and circumstances with which the beneficiary was connected, and were admissible as tending to identify the agency which produced the original result, and as tending to fortify antecedent conditions. In the case at bar there is evidence which, if believed, tended to show a continuous effort on the part of the testator's wife to create in his mind a feeling of disregard for his children, and that she procured the making of the will in the first instance against his wishes, and thereafter, by the same means, prevented a revocation of it. In view of such facts, and to weaken the presumption of the validity of the will to be drawn from its nondestruction during the period of ten or eleven years, we think the evidence was not open to objection on the ground of remoteness, especially in view of the fact that the presumption referred to was most strongly indulged and urged by the respondent. It is no answer to say because some of these witnesses were permitted to testify to similar transactions and facts occurring at or about the time of the execution of the will, that

therefore no prejudicial error was committed in excluding
the subsequent transactions, declarations, and admissions.
As pointed out in the case just cited, the plaintiff was en-
titled to the excluded testimony not only as substantive evi-
dence of a fact in issue, but also as bearing on the question
of the continuity of the alleged exerted influence and the
prevention of a revocation of the will by the same means.

4.   Several witnesses, daughters of the testator, who were
called on behalf of the plaintiff, on defendant's objection,
were not allowed to testify as to any declarations or state-
ments made by the testator or Margaret Miller, the sole lega-
tee, or as to any transaction with either of them, or as to
any matter of fact which must have been equally within
the knowledge of the witness and Thomas Miller or Mrs.
Miller.   The plaintiff MissMargaret Miller was not permitt-
ed to answer the questions as to whether in the year 1890,
the year the will was made, and while visiting the Millers,
she had any business dealings with Mrs. Miller, nor as to
what Mrs. Miller's conduct and feelings then were towards
her, nor thereafter as to any conversation had with Mrs.
Miller about the property left by the testator.   Another
daughter, Mrs. Morgan, was not permitted to testify that
Mrs. Miller told her that Mr. Miller was easily influenced
and that she (Mrs. Miller) could influence him any way
she pleased.   These, and other witnesses, daughters of de-
ceased, were not permitted to testify to any conversation
had with Mrs. Miller touching any matter in issue, nor as
to her feelings of jealously or antipathy manifested by her
towards them, and her efforts in avoiding the presence alone
of Mr. Miller alone with any of his children, nor as to state-
ments made by their father of his success in business, his
regard and love for them, and his desire of having them
with or near him, but being prevented by his wife from
doing so, cautioning them not to write to him about money
matters, the jealous and disagreeable dispositon of his wife
and her constant endeavors to cause him to disregard his
children, his unhappy life on account of it, his intentions of
leaving all his property to his children, who, he said, were

his rightful heirs and were entitled to it, nor as to any statements made by, or any transaction had with, either Mr. Miller or Mrs. Miller, or as to any matter of fact which must have been equally within the knowledge of the witness and Mr. Miller or Mrs. Miller. These rulings were made under sections 3412 and 3413, Revised Statutes, 1898, which sections, it is claimed, disqualified the witnesses. Section 3412, so far as material, provides that all persons, except as specified in the subsequent section, may be witnesses, and that neither parties, nor other persons who have an interest in the event of the action or proceeding, are excluded. Section 3413, so far as material, provides that the following persons cannot be witnesses:

"A party to any civil action, suit or proceeding, and any person directly interested in the event thereof, and any person from, through or under whom such party or interested person derives his interest or title or any part thereof, when the adverse party in such action, suit or proceeding claims or opposes, sues or defends as guardian of any insane or incompetent person, or as the executor or administrator, heir, legatee, or devisee of any deceased person, or as guardian, or assignee, or grantee, directly or remotely, or such heir, legatee or devisee as to any statement by, or transaction with such deceased, insane, or incompetent person, or matter of fact whatever, which must have been equally within the knowledge of both the witness and such insane, incompetent, or deceased person, unless such witness be called to testify thereto by such adverse party, so claiming or opposing, suing or defending in such action, suit, or proceeding."

The first question presented is, Does the statute apply to a contest of a will? If it does, then the second question is, Were the witnesses such as are named in the statute as being disqualified? The statutes of the various states differ, but there is an underlying principle upon which all of them are founded. The purpose of these statutes is to guard against the temptation to give false testimony in regard to a transaction in question on the part of a surviving party, and, further, to put the two parties to the suit upon terms of equality in regard to the opportunity of giving testimony (3 Jones, Ev. 790), and that the scope of the rule excludes the testimony of the survivor of the transaction with a de-

31 Utah—28

cedent when offered against the latter's estate (Wigmore
on Ev. 578). The statute in this regard is intended to pro-
tect the estates of deceased persons from assaults, "and re-
lates to proceedings wherein the decision sought by the party
so testifying would tend to reduce or impair the estate, and
does not relate to the relative rights of the heirs or devisees
as to the distribution of an estate in a proceeding by which
the estate itself is in no event to be reduced or impaired."
(*Pigg v. Carroll,* 89 Ill. 205; *Fleming v. Mills,* 182 Ill.
464; 55 N. E. 373; *Henry v. Hall,* 106 Ala. 84, 17 South.
187, 54 Am. St. Rep. 22; *Flood v. Dragoff,* 79 Ky. 607;
*McCoy v. Conrad,* 64 Neb. 150, 89 N. W. 665; *Williams
v. Miles,* 68 Neb. 463-479, 94 N. W. 705, 96 N. W. 151, 62
L. R. A. 383, 110 Am. St. Rep. 431; *McHugh v. Fitz-
gerald,* 103 Mich. 21, 61 N. W. 354; *Mackin v. Mackin,*
37 N. J. Eq. 528; *Hays v. Ernest,* 32 Fla. 18, 13 South.
451; *Shailer v. Bumstead,* 99 Mass. 112; *Foster's Ex'rs
v. Dickensen,* 64 Vt. 233, 24 Atl. 253; *Poulson v. Stanley,*
122 Cal. 655, 55 Pac. 605, 68 Am. St. Rep. 73; *Millay v.
Wiley,* 46 Me. 230; *Tucker v. Whitehead,* 59 Miss. 594;
*Harris v. Hays,* 53 Mo. 90.) These authorities, and oth-
ers which can be cited, hold that the controversy such as
here is between living parties, who, on the one side, are the
devisees or legatees under the will, and on the other, the
heirs at law of the testator. The former claim to take the
estate under the will, the latter, under the statute regulating
the descent of estates, insisting that the alleged will is a
nullity. The act of the testator in making the alleged will
is the only subject-matter of the investigation. The estate
of the testator is not interested. The interests of these
claiming to succeed to it ,either by operation of law or by
operation of the will are alone involved. The estate re-
mains intact and undiminished whatever may be the result
of the controversy, and the subject-matter of the investiga-
tion is not a transaction with nor a statement by the decedent.
As to such an investigation, the parties to the suit and those
interested in the result thereof are upon terms of equality in
regard to the opportunity of giving testimony. Our conclus-

ion, therefore, is that all the parties interested are competent to testify to any fact which is relevant and material to the issue involved, and that the court erred in excluding the proffered testimony. We are aware of some cases which hold contrary to this ruling, and that the conclusion reached by us is in conflict with the case of *Atwood's Estate,* 14 Utah 1, 45 Pac. 1036, 60 Am. St. Rep. 878, where the statute was given application in the contest of a will. But the question as to its application in such a case was not there discussed nor considered. The only question considered was whether the witnesses claimed to be disqualified were such persons as are named in the statute. However, the Atwood Case, so far as in conflict with the holding in this case, is overruled. We also are of the opinion that, were the statute given application, while it would disqualify the witnesses from testifying as to matters of fact which must have been equally within the knowledge of the testator, or as to any transaction with or statement made by him, yet it would not disqualify them from testifying as to statements made by or transactions with Mrs. Miller, deceased, or as to matters of fact which must have been equally within her knowledge, notwithstanding the fact that Mrs. Livingston, her heir, in her individual capacity, was a party defendant and adverse to the plaintiff in the action. It is conceded by counsel for the respondent that, had she not been such a party, the witnesses probably would not have been disqualified from testifying as to statements made by, or transactions with, Mrs. Miller. If any estate at all was involved in the controversy, it was the estate of Thomas Miller, deceased, and not the estate of Margaret Miller, deceased. Margaret Miller was the legatee or devisee of the deceased, Thomas Miller. Mrs. Livingston was the heir of the devisee. To bring Mrs. Livingston within the statute as an opposing party, she must be a guardian, assignee, or grantee of an heir, legatee, or devisee of the deceased person, Thomas Miller. While she was an heir of the legatee or devisee of the deceased person, she was not a guardian, assignee, or grantee of such legatee or devisee; and hence does not come

within the statute specifying the persons as opposing suitors, and therefore the witnesses are not such as are named in the statute as being disqualified. The following cases well illustrate the competency of the witnesses to testify as to the statements made by Mrs. Miller, deceased, and as to matters of fact equally within her knowledge: *De Baum's Will (Sur.)*, 4 N. Y. Supp. 342; *Fleming v. Mills*, 182 Ill. 464, 55 N. E. 373.

5. Having reached the conclusion that the court erred in excluding competent testimony material to the issue involved, the question arises whether we should consider the excluded testimony as in evidence in connection with all the other evidence in the case, and pass upon the question as to whether the findings are against the evidence or as to what findings and judgment ought to be made. This depends largely upon the view taken by us as to whether the action is one at law or in equity. We do not, however, desire to be understood that we would, in all cases in equity, so consider excluded evidence, but, if this case be one at law, we are precluded from such consideration of the testimony, except to determine the sufficiency of all the evidence to support a judgment. As to such sufficiency we entertain no doubt. The Probate Code, under the title of the "Probate and Contest of Wills," provides (section 3794, Revised Statutes 1898):

"If the court is satisfied, upon the proof taken, or from the facts found by the jury, that the will was duly executed, and that the testator at the time of its execution was of sound and disposing mind, and not acting under duress, menace, fraud, or undue influence, a certificate of the proof and of the facts signed by the judge and attested to by the seal of the court, must be attached to the will."

Section 3796 provides that any person who has not contested the will, etc., may contest the same or the probate thereof at any time within one year after its admission to probate. Section 4041 provides that all issues of fact joined in probate and guardianship proceedings must be tried in conformity with the requirements of the Code of Civil Pro-

cedure, and in all such proceedings the party affirming is the plaintiff, and the one denying or avoiding is defendant. Section 4042 provides that, if no jury is demanded, the court or judge must try the issues joined. If the trial of the issues joined requires an examination of an account, the court or judge must try the matter or refer it, and no jury can be called. We think the issues as joined presented a case at law, and that either party on demand therefor would have been entitled to a trial by jury as matter of course in conformity with the requirements of the Code of Civil Procedure. Being a case at law, we are not at liberty to treat as found that which might have been found, or to weigh and pass upon conflicting evidence, or to pass upon the credibility of the witnesses. In such a case these are matters within the province of the trial court, when the case is tried before the court without a jury, and within the province of the jury when tried before a jury. The rule applying to conflicts in, and weight of, evidence, and the credibility of witnesses, is the same in a will contest as in other cases at law tried before the court or jury. These views find support in the California cases under statutes quite similar to ours. (*Carpenter v. Jones,* 121 Cal. 362, 53 Pac. 842; *In re Wilson,* 117 Cal. 262, 49 Pac. 172, 711; *Estate of Tibbetts,* 137 Cal. 123, 69 Pac. 978; *Estate of Wickes,* 139 Cal. 195, 72 Pac. 902; *Langdon v. Blackburn,* 109 Cal. 19, 41 Pac. 814; *Estate of Benton,* 131 Cal. 472, 63 Pac. 775.) It is, therefore, not within our province to pass upon the weight or effect of the excluded or admitted testimony, and from all of it determine what findings of fact ought to be made.

The judgment is therefore reversed, and a new trial granted. Costs are to be taxed against respondent.

FRICK, J. (concurring).

I fully concur with my Brother STRAUP upon all grounds upon which the case is reversed, and concur with him in remanding the cause for a new trial, for the following reasons: (1) Because I am convinced that a will contest is

a purely legal proceeding under the statutes of this state, and
therefore each party to such contest is entitled to a trial in
strict conformity to the legal rules and practice pertaining
to trials of law cases. ' (2) Because the lower court erred
in excluding evidence which was admissible in favor of the
losing party, and therefore the court has at no time, and in
no manner, considered or weighed the excluded evidence,
all of which such party has a right to have considered and
weighed in connection with all other evidence in the case. (3)
Because this court has no right to weigh the excluded evi-
dence, nor to consider it, except for the one purpose of de-
termining whether it is or is not proper evidence to be con-
sidered in the case.   The losing party being deprived of his
legal right of submitting all proper evidence to the trial
court, or to a jury, cannot, as a matter of law, be required
to accept the judgment of this court as to the weight or ef-
fect of the evidence in the first instance, and before he has
had the opportunity to submit it to the triers of fact.   If
this court should weigh excluded evidence, we would do
precisely what the Constitution forbids, and would substi-
tute our judgment, in the first instance, for the judgment of
the trial court, or a jury, upon a question of fact.   This
would be a usurpation of power.   (4) Because we have no
right to pass upon evidence in any case at law, whether ad-
mitted or excluded, except for the purpose of determining
in the one instance whether there is any evidence in sup-
port of the findings and judgment, and, in the other, wheth-
er it is possible, in any event, for the party whose evidence
was excluded, to make a case as a matter of law.   (5) Be-
cause this case is not one in which we have a right to say,
in advance, that the losing party, with the excluded evidence,
and with other, which the new trial furnishes him opportu-
nity to produce, when considered and weighed by the tribu-
nal created by law for that purpose, for his benefit, may not
make a case which will support findings and judgment in
his favor.   In this case, as is clearly pointed out by my
Brother STRAUP, the trial court excluded all statements pur-
porting to have been made subsequent to the making of

the will by Mrs. Miller, the sole legatee and devisee of the will, and which were offered upon the ground of declarations against interest. All such declarations were admissible as substantive evidence against any party claiming under or through her, whenever or wherever made, so long as they were against her interest and tended to shed any light upon the matter under consideration. We therefore have no right to anticipate results, except in a very clear case, and, in my judgment, this is not such a case.

While the foregoing are but the legal deductions to be drawn from the opinion of my Brother STRAUP, I deem it best to state them in this form to avoid, if possible, any question respecting the exact grounds upon which I concur in remanding the cause for a new trial.

McCARTY, C. J. (concurring in part and dissenting in part).

The trial court found: "That the instrument heretofore admitted to probate by this court as the last will and testament of said Thomas Miller, deceased, was not signed or executed by him under duress, restraint, coercion, or undue influence, or by reason of any fraudulent or false representations made to him as set forth on the fourth paragraph of said petition for the revocation of said will, or under any duress, restraint, coercion, or undue influence whatever, nor by reason of any false or fraudulent representations made to him by his wife, Margaret Miller, or any one else; and the court finds that the allegations of the fourth paragraph of the said petition are not true."

Appellants contend: First, that the foregoing findings of fact are not supported by the evidence, and are contrary thereto; and second, that the court erred in excluding certain testimony which was offered by appellants in support of their contention that, when Thomas Miller executed the will in question, he was acting under undue influence. I agree with my Brethren that, this being a law case, and as there is a substantial conflict in the evidence on the material issues raised by the pleadings, this court is prohibited from

reviewing the facts for the purpose of determining whether the findings complained of are supported by or are contrary to the weight of the evidence. Therefore the only questions to be determined are those relating to the rulings of the court in rejecting the evidence referred to and hereinafter set out in detail. The testimony excluded by the trial court tended to establish two propositions: (1) That Mrs. Miller was jealous of, and unfriendly toward, Mr. Miller's children, and that this feeling of hostility toward them was at least one of the motives which prompted her to procure the drawing and making of the will in question; and (2) that Mr. Miller was very much attached to his children and his affections for them were not weakened, and he was not influenced or prejudiced against them because they were disliked by Mrs. Miller. It is not claimed, nor does the excluded testimony, standing alone, or when considered in connection with other evidence in the record, show, or tend to show, that Mr. Miller was wholly or in part influenced to make the will because of Mrs. Miller's attitude toward his children. In other words, while the testimony, if admitted, would tend to show that Mrs. Miller, because of her dislike for the children, was, at least to some extent, influenced in her actions and general conduct in relation to the matters, in controversy, yet it would wholly fail to show, or tend to show, that Mr. Miller was influenced in any degree to make the will because of Mrs. Miller's hatred for his children. If, however, there were testimony in the record which tended to show that Miller was influenced to make the will because of Mrs. Miller's attitude toward the children, a different question would be presented. But, as I have stated, the excluded testimony, if admitted, would utterly fail to show, or tend to show, that any one other than Mrs. Miller was influenced in the matter because of her dislike for the children. Therefore I respectfully submit that the testimony was immaterial, and that the court did not err in ruling it out.

But conceding, for the purposes of this case, that, as an abstract proposition of law, the testimony was admissible, I still

insist that, under the circumstances, appellant could not have been prejudiced by its exclusion. In order to demonstrate this it will be necessary for me to quote at considerable length from the testimony in the case. The witness Schettler testified in part as follows: "I drew the will at the request of Mrs. Miller. . . . She came to me and told me that she wanted to make it—have it made so as to cut off those children with $1 apiece, and she would fix them. She said that this life had been very unpleasant to both of them, . . . and she wanted the will made out so as to cut off the children with $1 apiece and give her all the property, . . . and that Mr. Miller was wanting to favor his children in New York, and she knew what they were and she would not have it so. . . . In 1898, or 1899, or 1900, along there, I was at their house. Occasionally the conversation would lead towards his former life and his children and the manner in which Mrs. Miller treated them. The conversation was such that she evidently did not want to have anything said about it. She did not propose to have any rupture right there in our presence." After some further examination, the witness was asked the following question: "How did Mrs. Miller act towards Mr. Miller when anything was said about his children?"—referring to the dates 1898-1900. The purpose of the testimony sought to be elicited by the question was, as stated by counsel for appellants, "to show that Mrs. Miller had this will made out in her own favor, for her own benefit, principally because she had a hatred for Mr. Miller's children." An objection was made to the question on the ground that it was immaterial and too remote, which objection was sustained by the court. The witness was permitted to further testify that "she [referring to Mrs. Miller] said that she was anxious to get that will made out that she might have her own way and fix those children." Counsel for appellants, in his brief, says that this evidence was competent as tending to "throw light upon the situation or give the reasons or motives of the conduct of the party." Conceding that it was competent for the purpose indicated, can it be said that appellants were pre-

judiced by the ruling of the court when the facts sought to be elicited by the question had been testified to over and over again by the witness? And further, the record shows that the witness had just stated what Mrs. Miller's conduct was "when anything was said about the children." Therefore an answer to the question would have only been a repetition of what the witness had already testified to and in regard to a matter about which there was no conflict in the evidence. It is a well-settled rule of practice "that the reception of evidence which is merely cumulative in its character rests in the sound discretion of the court." (3 Jones on Evidence, 814; 8 Ency. Pl. and Pr. 74, and cases cited.)

Complaint is made because the court ruled out the following statement, which appears in the deposition of Mrs. McIntosh. "Mr. Miller was constantly under the influence and control of his wife inasmuch as he did not dare to express any opinion about his children in her presence." On motion of counsel for respondent this testimony was stricken out on the ground that it called for a conclusion of the witness and was irrelevant. It is unnecessary for me to enter upon a discussion of the question as to whether this testimony falls within any of the exceptions to the general rule which holds that the opinions of nonexpert witnesses are irrelevant, as the witness in other parts of her deposition which were admitted in evidence, detailed the facts upon which it appears she based her conclusion that Miller was constantly under the control and influence of his wife. She says: "Mr. Miller, he told me that his wife was very jealous of his regard for his children; that he could never speak to them in terms of regard or affection without exciting her displeasure, which was very marked and caused him great unhappiness; . . . that he intended to make another will which he would keep secret from her, in which he would provide abundantly for his children; that he did not dare to inform his wife of this intention and would not dare inform her of it after he had carried it out, because she would make his life miserable if she knew it as she had done before he yielded to her and made the existing will." And

furthermore, she was permitted to testify to statements alleged to have been made by Mr. Miller respecting the ultimate fact sought to be established by the contestants, namely, that the making of the will was procured by "undue influence." In the course of her deposition she says: "Mr. Miller informed me upon one of the occasions when he spoke of his will and how unsatisfactory it was, and that it did not express his wish but the wishes of his wife." And again: "That the will was not his wish but her wish, and it did not express what he desired or intended to do." Miss Laura Miller, granddaughter of the testator, Thomas Miller, testified in part: "I visited my grandfather in Salt Lake City from November, 1900, to March, 1901. . . . Mrs. Miller told me many times that my grandfather had to do just as she told him, and that she had had the property and money fixed to suit her, that he had no will in the matter but hers, and that she could and did rule him in every respect." And further: "Mrs. Miller always asserted that the family would get nothing, as she fixed them all right, having compelled him to put everything in her name, having gotten him to make a will leaving her everything." The testimony of the witness Schettler given at the hearing when the will was probated was admitted in evidence, and, in part, was as follows: "Mr. Miller was of sound mind so far as he could be under the circumstances; there were peculiar circumstances that he might not have been composed mentally. He was of unsound mind to a certain extent, . . . for the reason that he could not do as he wanted to; that his wife made him do certain things he didn't want to do. Q. What things did she make him do? A. Sign that will. She was not there, but she made him sign it because he told me he didn't want to do it; not then and there, but he told me at other times that the thing wasn't right; he said it was not according to his wishes." The foregoing, as I read the record, is practically all the evidence in the case, and is all that was offered which tends to support the claim of appellants that the will was made "under undue influence."

I concur in the prevailing opinion in this case wherein it is held that the children of Thomas Miller do not come within the inhibition of section 3413 of the Revised Statutes of 1898, but I am of the opinion that the exclusion of the testimony which appellants offered to produce by these witnesses was not prejudicial error. They proposed to prove by Margaret Miller (daughter of Thomas Miller): That "Mrs. Miller came to her one day and handed her some deeds signed by Mr. Miller to some real estate that had belonged to her own mother, and that Mrs. Miller remarked to her: 'That is all the property you will ever get from your father's estate. I have fixed everything so that you children will get nothing.' That one morning Miss Miller asked Mrs. Miller in what condition her father left his property. That Mrs. Miller flew into a rage and said: 'What business is it of yours? You have no interest in this property. I have the matter all fixed up, and he made his will and made everything in my favor, and you children are not to have anything, or have any say about it.'" Now, it is apparent that this testimony, if admitted, could have no bearing whatever on the question of undue influence. It relates to incidents which transpired long after the will was made, some of which happened after the death of the testator, and would only tend to show that Mrs. Miller disliked Miller's children, a fact about which there was absolutely no conflict in the evidence. Mrs. Capell, daughter of testator, recited in substance, in her deposition which was excluded, that she went with her father to Europe in 1893; that during the trip her father told her that his was the only brass foundry business in Salt Lake City and that it was exceedingly profitable; that he was banking $1,000 per month with Jones & Schettler's bank; that he owned property in different parts of Salt Lake City; that he owned mortgages on a number of houses, one of which was for $7,000; that he was president of a mining company, and owned 500,000 shares of stock in the company; that he was a wealthy man and at his death his children would all be made wealthy out of his estate; that his property rightfully belonged to his chil-

dren, and that he would see that they got it; that in any correspondence she might have with him she must never mention money matters, as his wife was very jealous of his children, and resented his giving them any assistance or doing anything for them; "that no woman could ever take the place in his heart of the mother of his children." It is further recited in the deposition that "she [speaking of Mrs. Miller] appeared one morning at breakfast with some of my mother's clothes on, and continued to take and wear mother's clothes while she was there. We remonstrated with her and with my father over this, and told them that it made us very unhappy to see another woman wearing our mother's clothes, whereupon she would cry and plead with my father to let her wear them as she had no clothes and no money to buy them." Mrs. McIntosh, in that part of her deposition which was stricken out, says: "Mr. Miller told me confidentially there was a mine he had kept from his wife's knowledge, and asked me, as a personal favor, to tell the children this because he feared that his life might be taken before he completed another will which would provide bountifully for them without his wife's knowledge." Now, this testimony, as well as that of Mrs. Capell, if admitted, would tend to show that, when Miller spoke of providing for his children by will, he had in mind the wealth which he expected to realize from his mining investments, for it is apparent that he could not have intended to provide "bountifully" for his five children and that they "would be made wealthy" out of his other property, which, according to the inventory filed in the case, did not, at the time of his death, exceed in value the sum of $17,000. And the only reasonable inference that can be drawn from the record is that the value of his property, independent of his mining interests, was much less at the time these statements were made than it was at the time of his death. Mrs. Capell's testimony would further tend to show that Mrs. Miller did not domineer over her husband, and, by her superior will power, keep him in that state of fear and abject submission that much of the evidence in the case would imply. According to her

deposition, we have Mrs. Miller, at least on one occasion, crying and pleading with her husband to permit her to do certain things. This evidence, and that part of Mrs. McIntosh's which I have just considered, was more favorable to respondent than it was to appellants, therefore appellants could not have been prejudiced by the rejection. True, the rulings of the court in rejecting much of the testimony referred to are, in the main, based upon erroneous grounds, but the cause ought not to be reversed because the reasons assigned by the court are erroneous, provided such rulings can, as I contend, be upheld on other grounds. (3 Cyc. 222, and cases cited in note 56.)

In conclusion will say that I am of the opinion that the trial court did not commit prejudicial error in rejecting the evidence herein referred to, and that the judgment of the trial court ought to be affirmed.